Good morning, your honors. May it please the court. I'm Geraldine Sumter with Ferguson Chamber Center in Charlotte. We represent Chazz Roberts in this appeal from the denial, or rather, from the granting of the motion for summary judgment by the defendant. This case involves a young man who worked in an all-male work environment. The defendant was a company that engaged in various underwater activities for power companies. In our case, the prominent one was Duke Energy Company. Our client was hired as a diver. There were various waterways where Duke Power had discharges of fly ash or other such things, which these divers were going in to clean out, repair various equipment, or what have you. Soon after he began his employment with the company, he began to be harassed or subjected to offensive comments that were both subjectively and offensively, objectively and subjectively offensive. They came from co-workers, but also from his immediate supervisor, a fellow named Andrew Reiner. The affidavit and testimony from Mr. Roberts is that this behavior was constant, repeatedly done in every job that he worked with Reiner as his supervisor, and it was pervasive. The specific comments in the record included things like calling him gay, constantly calling him gay, asking him questions like, how many dicks do you suck for money, calling him retarded, saying he had the strength of a retard, and Reiner admitted in his deposition that he may have called him gay and faggot. There was an instance where Mr. Roberts was photographed in a white coverall suit called a trivet suit. They took a photograph of it and did a meme and said that he was basically a bag of shit. Now, these comments, Mr. Roberts testified, were repeated, they were offensive to him, they were witnessed by other managers, including Reiner's manager, Brandon Neal, and they were reported to managers. He reported them to Brandon Neal, he reported them to Bruce Evans over four times, Bruce Evans is a higher level manager, and equally importantly, he reported them to a woman named Anna Glenn, who was the wife of the owner of the company, who at the time that he made the reports in November of 2015 and January of 2016, was serving in the role of the human resources point person. Never is there, there's no evidence that there was ever any investigation done, there's no evidence in this record that any action was taken to prevent this conduct. In fact, Mr. Roberts began work with the company in July of 2015, and his undisputed testimony is that this behavior began soon after he was employed and continued until the time of his discharge. So that at any point in his employment, a complaint from him had been taken seriously, it certainly did not result in the cessation of that behavior. And so any policy that the company had was not either not followed, certainly if followed, was ineffective in bringing the behavior to an end. The plaintiff did not report his concerns to the president of the company, but that failure to report them directly to the president of the company does not absolve the company of its obligations and responsibilities to investigate the matter. Now, the big question here is whether Mr. Roberts can make a same-sex sexual harassment claim without adhering to one of the three avenues outlined in Oncology. The last two don't apply in this case. There are no female comparables, and we have not made any allegations that Mr. Reiner, the person who is primarily the culprit here, was homosexual. But what we are... Do we, if we agree with you that the trial court misinterpreted Oncology as giving required examples rather than illustrative examples, let's say we agree with you. What's our next step? Do we send it back to the district court to continue the analysis on the right track, or do we go further and investigate the sufficiency of your allegations and the evidence regarding the content of what was alleged here? Yaron, I believe that the record presents you with sufficient evidence upon which to make a determination on the severity or the pervasiveness of the conduct. And so you could, in this instance, make that ruling. The evidence may not be as graphic as some other cases, but remember that in a sexual harassment case, the plaintiff can prove his case either by showing that the evidence was severe or pervasive. And certainly in this case, the evidence taken in the light most favorable to the plaintiff shows that it was pervasive. He says that it was constant, it was repeated. And even if the only thing that was said was that he was gay or a faggot, to have that repeatedly said to you, I would argue is sufficient upon which a decision of sexual harassment can be based. It's not a one time thing. Counsel, if I could ask you as follows Judge Keenan's question. Ordinarily, if the district court applies the wrong standard, and if we assume here they applied the wrong standard as to Onkali, we would ordinarily tell the district court what the correct standard is and then send the case back and let them in the first instance apply that standard, having never applied it before, having used it. And even if we assume the district court was wrong, we did have cases, even though unpublished, that seemed to embrace the Onkali standard as being an exclusive standard. So, I mean, is there a reason we wouldn't let the district court do it in the first instance? No, your honor, I gave you my preference. So, yes, if traditionally you are allowing the district court to review the evidence under your approved, newly announced standard, then that would be appropriate. But also, it can be done if we do the standard and we find that by this record, there's disputed fact. That's correct, your honor. And please keep in mind, this is on summary judgment. And so the plaintiff here not only gets all of the facts determined in the light most favorable to him, but also all of the inferences. And my time is winding down. So I do want to address the issue of retaliation. A defendant claims that our client did not complain directly to Rick Glenn, who was the owner of the company, who they say made the decision. I say that the knowledge of these earlier complaints made to his wife and the other managers is imputed to him. And it is a question of fact whether he knew. I would ask you to consider your decision in Westmoreland versus T.W.C. administration, which would allow a jury to make inferences on that evidence. Also, excuse me, can you give us some context here? Does the record show how big a corporation this is? And is that relevant in the determination of imputing knowledge? Your honor, the record in this case shows that this really is a company that has management predominated by family members. The person who was the supervisor here, Reiner, testified that at the time of his deposition, he was one of two project managers. And that the other one, the other project manager, was a son of the company. The person who was then doing human resources was the daughter of the company. And the vice president for operations was the title that the wife had. Are we talking then about a company that has, for example, fewer than 100 employees? Are we talking about thousands of employees? Do we know that from the record? You don't know from the record that they have thousands of employees. But they may have 100 or so, but it's not a thousand. Or it was not at the time that these incidents took place. So my point is that because of the number of family members in high level positions, the evidence is sufficient from which the inference can be made. Of course, the plaintiff shows you that even though they said they terminated him because of safety violations, that the value that they supposedly place on safety is undercut by the evidence in the record about them telling workers not to relate to safety issues, to Duke Energy, and about other instances of safety violations that were not, obviously, taken as seriously as they claim safety is important to them. And I thank you for that. And we'll use the rest of my time on rebuttal. Thank you, Ms. Sumter. Mr. Horowitz? Good morning, your honors. And may it please the court. I'm Jeremy Horowitz with the EEOC. We're appearing as amicus in this case to make, to address three issues with the district court opinion. First, that as your honors anticipated, the three examples in ONCAL were intended to be illustrative and not exclusive. Second, that the district court erred to the extent it refused, it categorically refused to consider evidence of physical harassment just because it was facially neutral. And third, that the employer in this case did not make the necessary showing to establish an affirmative defense under Farragher and Ellert. I'll turn you first to the ONCAL issue. The discussion in that case at 523 U.S. 80 to 81, shows that it begins with what the court termed the easy case of same-sex harassment based on sexual desire, and then emphasizes that that wasn't the only way to prove that same-sex harassment is because of sex. It then offered two examples before concluding that whatever evidentiary route the plaintiff chooses, the plaintiff always needs to prove that the discrimination is because of sex. Further underscoring that there aren't supposed to be the exclusive ways of showing discrimination because of sex, are the facts of ONCAL itself, where those facts don't fit within one of the three examples the court set forward, but the court still remanded to give the plaintiff the opportunity to show that the harassment the plaintiff there had faced was because of sex. Nearly every other circuit to address this issue has held that those three examples are not exclusive. Turning to the second issue, under the Supreme Court's decision in Harris and this court's decision in the Connor case, a court addressing a claim of harassment should not, it's supposed to consider the totality of the circumstances, which means that the court is not supposed to parse out which ones are facially neutral from those that are explicitly discriminatory, but instead should consider all of those. That's what this court explicitly held in the Connor decision and also in the Sunbelt Rentals case, that harassment can take multiple forms and where there's evidence of harassment that's explicitly discriminatory, the court should also consider evidence of harassment spatially neutral. A number of other cases have made that, made that, found that as well and the court therefore erred to the extent that it just refused to consider that evidence because it was not facially discriminatory. And finally, if I could go to the affirmative defense issue to the extent this court wishes to reach that. Under Farragher and Ellerith, an employer is presumptively liable for the harassment of its supervisor and when that, although it can, if that harassment doesn't reach the level of a tangible employment action, the employer can make out an affirmative defense, but to do so it needs to prove two things. First, it has to show that it acted reasonably in preventing and quickly correcting any examples of harassment. And second, it needs to show that the employee acted unreasonably in failing to take advantage of any of these corrective measures or in some other way in failing to avoid harm. And the employer here, a reasonable jury could find that the employer here didn't do either one. Its policy to address harassment wasn't designed effectively and it wasn't implemented effectively. And in addition, the response to Mr. Roberts's complaints weren't addressed effectively. And in fact, this is an issue that the defendant, by failing to brief it in the district court and by failing to respond to our arguments on this, the defendant is essentially waived. But to the extent this court wishes to address it, the policy was not reasonably designed or implemented. And Mr. Roberts also acted reasonably in making his complaints to the harasser supervisor, to another supervisor who had multiple complaints. And he also complained to the vice president and chief human resources officer of the company. And the company never responded. Or on the occasion that it did, it told him to quote, suck it up. So that's not a reasonable response. And therefore a reasonable jury could certainly find that the employer doesn't qualify for the affirmative defense. Unless your honors have any additional questions, then I thank you for your time. Thank you, Mr. Horowitz. Mr. Thurman. Good morning, your honors. Derek Thurman sitting in Charlotte, North Carolina with the Shoemaker, Lupin, Kendrick firm. As you know, I represent the defendants, Glenn Underwater in this case. Just to start out, a sexual harassment claim, as we know in the hostile or abusive work environment context requires proof of unwelcome conduct, which I think has been established. Proof that the harassment is based on the plane of sex or now after Bostock, the plane of sexuality. And conduct that is sufficiently severe or pervasive to alter the conditions of the employee's employment. And of course, it has to be imputable to the employer. The conduct here was not based on Mr. Roberts' sex or his sexuality. Notwithstanding Bostock, we still have Onkale. Bostock did not overrule Onkale. Bostock actually relied upon and cited Onkale. Onkale, in the context of the same sex claim, had three elements. And this court has, as the court noted, in unreported decisions, held that these are the three ways you prove it. I'll address. So counsel, is it your position that Onkale is exclusive? I believe it is. But even if it's not, I don't think it matters. There's no evidence in the record, as the EEOC argues, that, as the EEOC argues, Mr. Roberts was insufficiently masculine, that he failed to conform to traditional stereotypes. If I could follow up. If I'm remembering the district court's opinion correctly, its decision centered only on the Okale elements. Is that right? It did not go any further. That's correct, your honor. And I believe there's, I agree with Ms. Sumter, that there's enough evidence in the record for this court. If this court wanted to expand the Onkale elements, there's enough evidence in the record for the court to do so without remand. I think that would be judicially economical. But certainly it is within the purview of this court to remand if the court felt that Onkale needed to be expanded. Mr. Thurman, isn't this conduct severe and pervasive? You know, at first my reaction was, okay, you're, you know, men say things that are inappropriate. I've, you know, my whole career in a predominantly male environment. But you know, if this had been a woman subjected to this, we'd be shocked by this conduct. So why does anybody get a pass because they're a man for making comments like this? Well, I don't think the evidence is as strong on severity or pervasiveness as my colleague suggests. In his deposition, Mr. Roberts talked about being called gay on several occasions and talked about the money comment on several occasions. Important to note, those are the only two comments that have anything to do with sexuality. You know, yes, he was called retard and some other things. But the only two comments he testified to that have anything to do with sexuality were being called gay and the odious comment about money. And he says it happened on, you know, several occasions in his deposition. Not until his declaration of summary judgment does he say, oh, it happened all the time. And even then, he doesn't tell us how often it happened. He doesn't give a specificity. He just said it happened a lot. So I'm not sure we have, there's not enough evidence in the record for us to decide whether or not it might have been severe and pervasive. But there's just not enough evidence in the record for us to, for the court to rule on that. And I believe that's how the district court was of that opinion. Moving on, the, so if we're looking at Onkale, you know, my colleague concedes that we're only looking at one evidence, and that is whether or not the, there's credible evidence that the alleged harasser was homosexual and made explicit or implicit proposals of sexual activity. That just did not happen. He called him names, terrible names, but that's what he did. He called him names. Now, if we move beyond Onkale, there's no evidence in the record suggests that he's- Based on, Mr. Thurman, based on your evidence and your side of it, how many times was he called these horrible names? It's not in the record, your honor. Nobody testified to that. Nobody, you know, put any evidence to that. Did you refute that it was ongoing? I believe Mr. Reiner admitted to calling him certain names on occasion. Okay, yeah. I don't, I don't think either side. Yes, your honor. Several occasions. So you didn't refute that, several occasions. No, I agree. This happened on several occasions. I just don't think it rises to the level of severity or pervasiveness. Okay, well, pervasiveness, again, it can be in terms of just, I mean, I just can't imagine, you know, like a jury, you never asked them to put themselves in a shoot, but can you imagine, you know, you being, you have to go to work and you're trying to make a living? And why does that have to, why should that come alongside with the work environment, those kinds of comments? Keenan said, man or woman being the target of, I mean, it's disgusting, isn't it, to me, to put someone through that because they have to work? I agree, it's disgusting. I think the point is, this was not because of sex. This was not because of his sexuality. That's the problem here. These weren't directed at him because he's gay or because he's a man. But the evidence was, didn't he say that it was, there was comments that, you know, you're not carrying your weight, you know, you have, you're effeminate in the sense of your ability to have brawn and those things like that. That deals with gender, doesn't it? He's saying, you don't fit a stereotype of the gender that I should have. If you're a man, you should be able to do this. Or you should be able to come along. Isn't that related to sex or gender are covered in these comments, correct? I don't think there's any evidence on the record that there is any suggestion that he was effeminate, that he was not strong enough, that in fact, he was told he was, hey, he had retard strength. I don't know what that means. But, you know, there's nothing in the record that he did not testify that he was told he was effeminate. He was told he couldn't cut it. The only evidence- Why was he subjected to the question of whether or not he would perform fellatio for money? How much money? What was that about? Well, I think that falls under the Seventh Circuit and Johnson v. Hondo, I think this is, excuse my language, says, most unfortunately, expressions such as fuck me, kiss my ass, and suck my dick are commonplace in certain circles. And they have no connection whatsoever with the sexual acts they reference. You know, it comes down to the horseplay admonition that Justice Scalia gave us in Oncale, that there are workplaces where these things happen. And, you know, we shouldn't attribute that automatically to actionable harassment. But again, I ask you to carefully peruse the record, because there's just nothing in the record other than those two odious comments. And then the retard comments- Mr. Thurston, no, no, I didn't mean to cut you off there. What about the fact that Reiner wasn't really specific? Didn't he say, I think it's Joint Appendix 180, where he said, maybe, when he was asked if he called Roberts, all those names. So, you know, he could have said, oh, I might've called him something once or twice. But, you know, we didn't do anything. He said, he was asked, did you say these things? And he said, maybe. Doesn't that create more of an issue that would suggest that it should go to a jury rather than me? Well, I think the problem is, you know, severity aside, was this because of his sex or because of his sexuality? I mean, if we follow the EEOC logic, Mr. Roberts could press a race discrimination claim if his supervisor had instead called him racial epithets several times over the course of employment. And that doesn't make sense. Why couldn't he bring a case of race discrimination? I'm not sure a white- If someone had been called those things. Oh, you're saying a Caucasian couldn't have. Yes. So as a white employee, Mr. Roberts could press a race discrimination claim if he were called racial epithets that are typically directed at persons of color. That doesn't make sense. It's the same argument. Right, but he has a sexuality. You know, whether he, apparently he's not gay, but he has a sexuality inherent in his personhood. So it's different from about whether a person is Caucasian, if they're African-American, if they're, you know, Asian-American, all different groups that are subject to, or although I guess less so because we are a very diverse country. And so, but sexuality is something that's inherent in everyone. So how do you get away from that? Well, sexuality is as inherent in everyone as skin color is inherent in everyone. And here his sexuality is straight. And there's nothing to suggest that Mr. Reiner was abusing him because he was straight because of his inherent sexuality. I guess we could have a reverse discrimination claim at some point, not in this case, but in other cases where someone's abused because of their straightness, as opposed to being abused because they're gay. Moving on to the- I think that was what the 28J letter was talking about though, in terms of Bostock and how Bostock is saying that gender stereotyping qualifies as discrimination because. So how do you get away from that, that the comment in Bostock, that the stereotyping is itself discrimination or can be discrimination because of sex? Well, there's no evidence in the record that there was any gender stereotyping going on here. If in fact, you know, he, other than just saying you're gay, I mean, saying you're gay doesn't suggest anything other than just using an odious term. I mean, it's just a ugly term. There's no suggestion here that Mr. Reiner thought he was actually effeminate or thought that he was actually not conforming to stereotypes. It's just a word he was using. It's just ugly comments he's using. There's no suggestion that he thought this gentleman was effeminate or was not making or matching certain stereotypes. You mean other than the words he was using as alleged? Other than the words. You know, there's nothing outside of that other than the words. But what else does it need to be in terms of harassment? It's your words that cut like a two-edged sword often. I mean, why would, why was there, at least as alleged, inferences here to be drawn in favor of the non-moving party? Why was there so much dwelling on these references to his sexuality being homosexual? I think you're talking about an ignorant person who probably, I don't know this, it's not in the record, who probably opposes homosexuality and therefore thinks that calling someone names associated with homosexuality is offensive and just wants to call someone names. And wants to hurt him, right? Well, I would assume so. And use sexual references to do it. I would assume so. But again, as the Seventh Circuit held, this is not uncommon in some workplaces and it's unfortunate, but it's not necessarily actionable. I hope you're not defending the Title VII case on the fact that it's uncommon. I wish it wasn't uncommon. But that's why we have cases like this because unfortunately it's too common. I agree with you. On the issue of retaliation, there's certainly no evidence of knowledge by Mr. Glenn who the handbook says is who you're supposed to report to. He did testify that he told Anna Glenn, who was Mr. Glenn's wife, that occurred over three months before the decision was made. And again, the decision was made by Mr. Glenn and there's no evidence she ever told him. But the most important part in the retaliation claim is the but-for issue. But for his misconduct, Mr. Roberts' own misconduct, he would still have a job. There's no evidence that his complaints of sexual harassment had anything to do with the decision that was made ultimately to terminate him. He engaged in unsafe conduct on two occasions, was disciplined about it, actually sat down in the room with the owner of the company, made no mention of the fact that he was being harassed in the workplace and ultimately was terminated. The evidence about the overall safety of the workplace, none of it addresses other employees engaging in safety violations. It's more of just a general gripe about certain things he was asked to do or not asked to do. You know, you don't have any evidence, you know, comparative evidence about other folks engaging. I think that's just a red herring. Unless the court has any other questions, I'm happy to cede the rest of my time. All right. Thank you, Mr. Thurman. Ms. Sumter, you have some time reserved. Yes, Your Honor. Thank you. First, Your Honor, I would say and ask the court to consider the Bostick decision in the context that Bostick says, basically, everybody of whatever sexual persuasion is covered by Title VII. And if everyone is covered by Title VII, then all of the stereotyping based on sexual orientation or perceptions of a person's sexual orientation or stereotyping is also covered by Title VII. And in this case, you have those comments which are sufficient to form the basis of a sexual harassment case without there being an overture of sex or an expression of an interest in engaging in some sexual activity with the victim because what you have is these acts of physical aggression by the supervisor coupled with his demeaning and insulting comments, which I believe show an animus against Mr. Roberts based on what he was, what Reiner wanted to impress upon him as how he should act. And so there is no evidence that either of these men were gay, but to be subjected to the constant taunting and harassing is a demeaning way that this supervisor misused his position to cast a dispersion on Mr. Roberts in a way that offends Title VII. It was all because of his sex. Had he been a woman, we don't know what he would be doing, but he was a man and he was being subjected to a standard of masculinity, if you will, by these comments and by this physical aggression. And that's why the evidence of the physical aggression is important. Now, the defendant argues that there is nothing in this record to show that there was any interest that Mr. Roberts was effeminate. Well, calling somebody gay and making these comments about him would suggest that his supervisor thought that he was or wanted others to think that he made them in the presence of the co-workers. And there is not in this record any denial by the defendant that the comments were inappropriate and had no place in the workforce. Now, the defendant is arguing that we cannot attach a retaliation claim due to the fact that they say that Mr. Roberts engaged in some safety violations. Well, the evidence in the record shows a number of instances where more egregious safety violations than a burn on the hand took place and those employees were not disciplined. And so a reasonable inference that could be drawn from that and the fact itself shows is that their explanation for his termination is pretextual. If a jury disbelieves Mr. Glenn when he says that he didn't know that there were earlier claims of discrimination, that doesn't require a finding of discrimination or retaliation, but it is sufficient upon which a jury may base its decision. And court... Yes, ma'am. Ms. Sumter, it does seem to me that the weak spot in your case today is this issue of imputation of knowledge to Mr. Glenn. Do you have case authority that we can rely on that talks about what we consider when there is no direct evidence of knowledge on the part of the person who's been designated as the reporting individual? Well, Your Honor, what we have is that knowledge to other managers can be imputed to him. We have case law on that, cases that we can consider that we could rely on for that proposition because I think that you can't just say because somebody's married to somebody he must have known about it. I mean, that's... I take your point and I would refer the court to the cases that we cited in our retaliation section, including Howard versus Winter, where the court said that you can... If a defendant was negligent and failing after actual or constructive knowledge to take prompt and adequate action to stop the behavior, that that's going to be sufficient. But it is a factual question, Your Honor. And because it is a factual question, the defendant denies having this knowledge. A reasonable inference could be raised that his chief operating or his chief of operations or his human resources person in a company that is highly controlled by family members would have made him aware of that fact. And if a jury believes that he did not know, then we won't have that. But if the jury does not believe him when he says he did not know, the plaintiff is entitled to prevail on that retaliation claim. So it's really a question of that. Okay. So do you have cases where the knowledge is imputed to the decision maker in the absence of... In other words, do you have any known or should have known cases that you want us to, particularly, take a look at? Yes, Your Honor. The Howard v. Wintercase and Struthers v. City of Laurel. Okay. And I thank you for your time here. Thank you, counsel. Thank all of you, counsel. Can't come down and greet you as we would love to do as in our normal tradition of the Fourth Circuit, but please know we appreciate your arguments. Thank you very much. And we hope that you'll be safe and stay well with that. I'll ask the Deputy Clerk to adjourn the court until this afternoon. Thank you, Your Honor. Thank you, Your Honor.
judges: Roger L. Gregory, G. Steven Agee, Barbara Milano Keenan